UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
STSG, LLC,

        Plaintiff,

       - against -

INTRALYTIX, INC., LYC HOLDINGS INC.,
and JOHN J. WOLOSZYN,

        Defendants.
-------------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 5569 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    The Court previously denied without prejudice the defendants'
motion to dismiss the complaint, following the defendants'
concession at oral argument—contrary to their prior position—that
plaintiff had some rights to information and inspection under the
agreement governing the loan between the parties.  Subsequently,
plaintiff exercised those rights and received documents from
defendants.  Based on information plaintiff obtained from those
documents, plaintiff now moves for leave to amend its complaint.
For the following reasons, the plaintiff's motion is granted in
part and denied in part.

# I. **Background**[1]

A. **STSG's Loan to Intralytix**

This litigation has its genesis in a series of agreements ("Agreements") that plaintiff STSG, LLC ("STSG") and defendant Intralytix, Inc. ("Intralytix") entered in 2003 to memorialize a loan of $1 million by STSG to Intralytix. Prop. Am. Compl. (ECF No. 47-2) ¶ 24. Those agreements include the Master Agreement, the Credit Agreement, and Convertible Promissory Note issued by Intralytix to STSG. Id. At the time, STSG was an active venture capital firm, and Intralytix was a start-up. Id. at ¶ 4. Under the Agreements, the loan was initially due on April 30, 2006. Id. at ¶ 26. As noted earlier, the Agreements provide STSG certain information and inspection rights. Id. at ¶¶ 28-35. The Agreements also placed a number of restrictions on Intralytix's activities, including prohibitions of making distributions to equity holders, incurring additional debts, and transacting with its affiliates. Id. at ¶¶ 36-38.

Section 7 of the Credit Agreement provides STSG with two distinct rights to convert its loan into Intralytix Class A Common Stock. Id. at ¶ 40. One of the two rights, defined as the "Initial

---

[1] The Court's inquiry in resolving this motion centers on futility, which in turn resembles an inquiry for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F. 3d 83, 88 (2d Cir. 2002). Therefore, the Court, in resolving this motion, "accept[s] as true all factual allegations in the [proposed amended] complaint and draw[s] all reasonable inferences in favor of plaintiff[]." City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).

Conversion Option," allows STSG to convert the outstanding loan balance into Intralytix Series A Common Stock at $36.45 per share. Id. Section 7.2 provides that this Option expires on the earlier of October 30, 2004 or Intralytix engaging in a private equity financing. Id. The other right, defined as the "Second Conversion Right," allows STSG to convert its loan balance into equity in Intralytix if Intralytix raises $3 million or more in gross proceeds through a single private equity financing transaction. Id. The price adopted in that financing determines the strike price of the Second Conversion Right. Id.

B.  **Transfer of Senior Loan to Meyerflyer**

In around April 2003, STSG also entered into an agreement ("Subordination Agreement") with Ecolab Finance Inc. ("Ecolab"), under which STSG consented to subordinate its loan to Intralytix to Ecolab's loan to Intralytix ("Senior Loan"). Id. at ¶¶ 5, 24. In around December 2008, Ecolab sold the Senior Loan to Meyerflyer, LLC ("Meyerflyer") for $225,000. Id. at ¶ 47. The Second Amended and Restated Promissory Note governing the Senior Loan as held by Meyerflyer indicates that the principal of $225,000 and accrued interest were due on June 30, 2010. Id.

C.  **Highflyer Transaction**

STSG learned through this litigation that Meyerflyer transferred the Senior Loan to another entity, called Highflyer, LLC ("Highflyer"). Id. at ¶ 52. In their brief in support of the

motion to dismiss the original complaint, defendants stated that the Senior Loan was then currently held by Highflyer, an entity that is owned and managed by several Intralytix affiliates, including defendant Woloszyn, the Chief Executive Officer of Intralytix. Id. STSG's further investigation has revealed that the SEC Form D filed by Highflyer for an exempt offering of securities was signed by Woloszyn as a manager of Highflyer. Id. at ¶ 54.

The Third Amended and Restated Promissory Note governing the Senior Loan as held by Highflyer indicates that Intralytix owed $334,407 to Highflyer. Id. at ¶ 58. Sulakvelidze, a Director and Corporate Secretary of Intralytix, signed the Note on behalf of Highflyer. Id. at ¶¶ 57-58. Under this version of the Note, the Senior Loan was due on the earliest of: (1) Intralytix raising $30 million in a single fundraising round of financing, (2) two-thirds of Highflyer partners calling the Note, or (3) an occurrence of Event of Default, as defined therein. Id. at ¶ 62. On June 1, 2017, Intralytix and Highflyer executed the Fourth Amended and Restated Promissory Note, modifying the $30 million threshold to $40 million. Id. at ¶ 63.

On June 7, 2017, Intralytix and Highflyer entered into an agreement ("Letter Agreement"), in which Highflyer expressed its intent to convert the Senior Loan into Intralytix Class A Common Stock contingent on satisfaction of a number of conditions,

including the settlement of STSG's loan to Intralytix. Id. at ¶ 65.

D. **Lesaffre Equity Financing**

On or about May 31, 2017, LYC Holdings Inc. ("Lesaffre") acquired 3,390,093 shares of Intralytix Class A Common Stock at $17.5 million. Id. at ¶ 77. The number of shares Lesaffre acquired represents 31.9% ownership in Intralytix. Id. In preparation of this transaction, Intralytix and Lesaffre entered into a non-disclosure agreement in January 2017 ("Non-Disclosure Agreement"), and Lesaffre thereafter conducted a due diligence review of Intralytix. Id. at ¶ 75.

The SEC Form D filed by Intralytix in connection with this transaction indicates that $1,881,733 of the proceeds would be paid to Intralytix officers and directors. Id. at ¶ 78. In particular, the Disclosure Schedule of the Stock Purchase Agreement between Intralytix and Lesaffre indicates that, upon closing of the transaction, certain amounts would be paid to Woloszyn, Sulakvelidze and another Intralytix Director in satisfaction of the loans they made to Intralytix in their personal capacities. Id. at ¶¶ 79-80. A portion of the planned payment to Sulakvelidze was for redemption of 100,000 shares of Intralytix Class A Common Stock he owned. Id. at ¶ 79. Intralytix used some additional amount of the proceeds to pay a portion of the "accrued salary" Intralytix owed to Woloszyn. Id. at ¶ 120.

On May 31, 2017, Intralytix, Lesaffre and certain Intralytix shareholders—including Woloszyn and Sulakvelidze—entered into an agreement entitled "Investors' Rights Agreement," which governs the rights of Intralytix shareholders. Id. at ¶ 95. Section 5.1 of this Agreement provides Lesaffre a right to acquire Intralytix's Intellectual Property, as defined therein, at fair market value upon dissolution or liquidation of Intralytix as long as Lesaffre is holding a certain amount of Intralytix stock. Id. at ¶ 96; Id., Ex. 22, § 5.1.

E.    **History of Disputes Between the Parties**

STSG learned about the Lesaffre transaction in July 2017 when Intralytix publicly announced it. Id. at ¶ 101. On October 10 and November 10, 2017, STSG sent letters to Intralytix, asserting that Intralytix had breached certain provisions of the Credit Agreement and asking Intralytix to produce certain documents in exercise of its information and inspection rights. Id. at ¶ 103. Although Woloszyn initially suggested that Intralytix would honor STSG's document demands, Intralytix eventually rejected them on December 15, 2017. Id. at ¶¶ 105-06.

STSG commenced this litigation by filing a complaint on June 20, 2018. See ECF No. 1. On August 17, 2018, defendants moved to dismiss the complaint. See ECF No. 17. The Court heard oral argument on the motion on March 7, 2019. See ECF No. 38. During oral argument, defendants retreated from their prior position and

conceded that STSG was entitled to financial information for Intralytix under the Agreements. Id. (Oral Arg. Tr.) at 20. Based on this concession, the Court denied without prejudice the defendants' motion to dismiss the complaint on March 19, 2019, reasoning that exercise of plaintiff's information and inspection rights foreseeably would alter the universe of allegations plaintiff could properly plead. See ECF No. 37.

Following oral argument, on March 14, 2019, STSG exercised its information and inspection rights. Prop. Am. Compl. ¶ 126. In response to STSG's demands, Intralytix provided some documents but refused to provide others, such as detailed capitalization tables, due diligence requests and responses concerning the Lesaffre transaction, and documents relating to Intralytix's transactions with Meyerflyer and Highflyer. Id. at ¶ 126.

On June 19, 2019, STSG sent a letter to Intralytix, exercising its conversion rights under the Credit Agreement and requesting $250,000 of the outstanding balance of its loan be converted into 48,430 shares of Intralytix Class A Common Stock upon the same terms and conditions provided to Lesaffre. Id. at ¶ 131. Intralytix denied the STSG's conversion request on June 25, 2019. Id. at ¶ 133. In its denial letter, Intralytix asserted that STSG's Second Conversion Right lapsed on October 30, 2004 when the Initial Conversion Option lapsed because the Second Conversion Right could only be exercised "in lieu of the Initial Conversion

7

Option." Id. at ¶ 133.  As an alternative ground for denial,

Intralytix also asserted that, even if STSG retained any conversion

rights after October 30, 2004, the Credit Agreement did not allow

conversion of only a portion of the loan.  Id., Ex. 27, at 2.

F. **Proposed Amendments to Complaint**

On September 13, 2019, plaintiff filed this motion for leave

to amend its complaint.  See ECF No. 47.  Plaintiff proposes the

following amendments: (1) to include additional factual

allegations and detail; (2) to assert tortious interference claims

against defendant Woloszyn based on his conduct involving

Highflyer and his receipt of Intralytix's payments with the

proceeds from the Lesaffre transaction; (3) to seek an order

requiring specific performance by Intralytix of STSG's conversion

demand; (4) to seek a declaratory judgment on the STSG's conversion

rights; and (5) to assert a claim for the attorneys' fees and

expenses incurred in connection with this litigation pursuant to

Section 3.4(c) of the Security Agreement.  See ECF No. 47-2.


## II. <u>Discussion</u>

A. **Legal Standard**

Federal Rule of Civil Procedure 15(a)(2) provides that the

court "should freely give leave when justice so requires."  Whether

to grant leave, however, is ultimately "within the sound discretion

of the district court."  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482

F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Id. In opposing this motion, defendants do not argue that the proposed amendments are the product of bad faith or undue delay, nor do defendants suggest that granting the motion would cause them undue prejudice. The Court agrees. Instead, defendants argue, and this opinion addresses, whether granting plaintiff leave to amend would be futile.

Because futility of the proposed amendments is evaluated under Rule 12(b)(6) standard, a motion for leave to amend may be denied if plaintiff fails to allege "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007). However, "a proposed claim may be found futile only where it is clearly frivolous or legally insufficient on its face." Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statute of Liberty Ferry, Inc., No. 01 Civ. 9788(NRB), 2003 WL 253094, at *1 (S.D.N.Y. 2003). As the parties opposing this motion for leave to amend, "[d]efendants bear the burden of demonstrating futility." Am. Fed. of State County and Mun. Employees Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co., No. 12 Civ. 2238(JPO), 2013 WL 6409323, at *3 (S.D.N.Y. Dec. 9, 2013).

B.  **Analysis**

Defendants argue that the proposed amendments would be futile on two grounds: (1) the Subordination Agreement precludes the proposed claims; and (2) only plaintiff's breach of contract claim is adequately pled.  The Court addresses each ground in turn.

1.  **Subordination Agreement**

Defendants first argue that the proposed amendments are futile because, while each of STSG's claims is based either directly or indirectly on the Intralytix's alleged failure to repay the STSG's loan, the Subordination Agreement prohibits Intralytix from repaying the STSG's loan as long as any amount of the Senior Loan remains outstanding.  <u>See</u> Defs.' Opp'n at 6; 7 n.4.

The Court agrees with defendants that, under Section 3(a) of the Subordination Agreement, Intralytix is prohibited from making any payment to STSG as long as any amount of the Senior Loan remains outstanding.[2]  <u>See</u> ECF No. 47-10, § 3(a).  Instead of disputing this proposition, plaintiff maintains that the Senior Loan was paid off in 2014 when Highflyer acquired the Senior Loan from Meyerflyer.  Pl.'s Mem. of Law (ECF No. 56) at 3. Specifically, plaintiff posits that Highflyer was a sham entity operated by Intralytix affiliates and, therefore, its acquisition

---

[2]     In evaluating the Intralytix's interpretation of the Subordination Agreement, the Court applies Minnesota law pursuant to the choice-of-law clause therein.  <u>See</u> ECF No. 47-10, § 11(a).  Therefore, its terms are given their plain meaning because the parties do not dispute that there is no issue of ambiguity.  <u>Metro. Airports Comm'n v. Noble</u>, 763 N.W.2d 639, 645 (Minn. 2009).

of the Senior Loan from Meyerflyer should be regarded as a buy-out of the Senior Loan by Intralytix, rendering the Senior Loan effectively repaid. Id. Defendants have failed to show the futility of this effort by plaintiff to disregard the corporate formality of Highflyer. Moreover, the question of whether to disregard the corporate formality would inevitably entail a fact-intensive inquiry that is not resolvable at this stage of litigation. Therefore, the Court rejects the defendants' claim of futility based on the Subordination Agreement.

2. **Adequacy of Pleading**

Having rejected the defendants' over-arching defense, we now turn to a claim-by-claim analysis of the sufficiency of the plaintiff's proposed amended complaint. Defendants argue that plaintiff fails to adequately plead its claims in Counts II through IX. The Court addresses each Count in turn.

a) **Count II: Breach of Implied Covenant of Good Faith and Fair Dealing Claim against Intralytix**

Defendants maintain that Count II of the proposed amended complaint is futile because it is duplicative of the breach of contract claim asserted in Count I. The Court agrees.

A good faith and fair dealing claim should be dismissed as duplicative of a breach of contract claim if "both claims arise from the same facts and seek the identical damages for each alleged breach." Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.,

894 N.Y.S.2d 47, 50 (N.Y. App. Div. 1st Dep't 2010)(internal citations omitted). "[T]o assert a cause of action for the breach of good faith and fair dealing that is not duplicative of [a] breach of contract claim, [plaintiff] must allege that [d]efendants fulfilled their contractual obligations but that those obligations were carried out in bad faith in order to deprive [plaintiff] of the benefit of [its] bargain." Joseph v. Gnutti Carlo S.p.A., No. 15 Civ. 8910(AJN), 2016 WL 4764924, at *7 (S.D.N.Y. Sept. 12, 2016)(internal quotations omitted).

The plaintiff's breach of good faith and fair dealing claim is entirely predicated on the Intralytix's conduct that constitutes the basis of plaintiff's breach of contract claim. Also, in asserting the breach of good faith and fair dealing claim, plaintiff alleges that "Intralytix has failed to perform things necessary to carry out the purpose" of the Agreements, not that it performed those things in bad faith. Lastly, plaintiff seeks to recover the same amount of damages under both claims. Under the circumstances, the plaintiff's breach of good faith and fair dealing claim is duplicative of its breach of contract claim.[3]

---

[3]    Plaintiff's argument that its breach of good faith and fair dealing claim is in part based on inappropriate exercise of discretion by Intralytix is without merit given the plaintiff's failure to cite any contractual provision granting Intralytix discretion.

b) **Count III: Unjust Enrichment Claim against Intralytix**

In Count III of the proposed amended complaint, plaintiff asserts an unjust enrichment claim against Intralytix. Defendants argue that this claim is also duplicative of the plaintiff's breach of contract claim. The Court disagrees.

Under New York law, unjust enrichment claims are "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon N.Y., Inc., 944 N.Y.S.2d 732, 740 (N.Y. 2012). Although "[p]laintiffs may not ultimately recover under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow [p]laintiffs to plead such claims in the alternative." Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014)(emphasis in original). "A court may allow a breach of contract and an unjust enrichment claim to proceed at the motion to dismiss stage when the validity or scope of the contract is difficult to determine." U.S. Bank Nat'l Assoc. v. BFPRU I, LLC, 230 F. Supp. 3d 253, 266 (S.D.N.Y. 2017).

Here, the parties disagree at least on the scope of the Senior Loan holder's authority to extend the maturity of Senior Loan under the Subordination Agreement. See Pl.'s Reply at 7; Prop. Am.

13

Comp. ¶ 106.    Given   the   uncertainties   surrounding   the
Subordination Agreement and other related issues, plaintiff may
proceed with an unjust enrichment claim against Intralytix at this
stage of litigation.

> c)  **Count IV: Tortious Interference with Contract
> Claim against Lesaffre**

In Count IV of the proposed amended complaint, plaintiff
alleges that Lesaffre tortiously interfered with the Agreements
between plaintiff and Intralytix in the course of negotiating and
executing the Lesaffre's acquisition of Intralytix Common Stock
shares.

Under New York law, the elements of a tortious interference
with contract claim are: (1) the existence of a valid contract
between the plaintiff and a third party; (2) defendant's knowledge
of that contract; (3) defendant's intentional procurement of the
third-party's breach of the contract without justification; (4)
actual breach of the contract; and (5) damages resulting therefrom.
Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1375 (N.Y.
1996).[4] "New York law emphasizes the requirement that a tortious
interference with contract claimant establish that the defendant

---

[4]    In their motion papers, the parties have not discussed the choice
of law issue with respect to the tortious interference claims asserted in Counts
IV through VI of the proposed amended complaint.  Defendants discussed these
claims under New York law, and plaintiff has not raised any objection as to the
defendants' choice of law.  Under the circumstances, the parties are deemed to
have acquiesced in the application of New York law to the evaluation of the
futility of these claims.  See Michele Pommier Models, Inc. v. Men Women NY
Model Manag., Inc., 14 F. Supp. 2d 331, 335 n.2 (S.D.N.Y. 1998).

purposefully intended to cause a contract party to breach a particular contract." <u>Conte v. Emmons</u>, 895 F.3d 168, 172 (2d Cir. 2018)(citing <u>NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.</u> 664 N.E.2d 492, 495 (N.Y. 1996)). Also, a plaintiff asserting a tortious interference with contract claim must allege that "there would not have been a breach but for the activities of defendants." <u>Sharma v. Skaarup Ship Manag. Corp.</u>, 916 F.2d 820, 828 (2d Cir. 1990).

In asserting a tortious interference with contract claim against Lesaffre, plaintiff alleges that Lesaffre induced Intralytix to breach four provisions of the Agreements: (1) Section 4.1(e) of the Credit Agreement; (2) Section 2.5 of the Credit Agreement and the STSG Convertible Promissory Note; (3) the STSG's Second Conversion Right; and (4) the Security Agreement. The Court concludes that the proposed tortious interference with contract claim against Lesaffre is futile on all four alleged bases.

(1)     **Credit Agreement Section 4.1(e)**

Section 4.1(e) of the Credit Agreement requires Intralytix to furnish STSG a "notice of the occurrence of any discussions . . . relating to the issuance of [new securities]," such as the Intralytix common stock shares sold to Lesaffre. Plaintiff alleges that Lesaffre intentionally caused Intralytix to breach Section 4.1(e) "by virtue of the Mutual Non-Disclosure Agreement" between

15

Intralytix and Lesaffre. Prop. Am. Compl. ¶ 76. This claim is fundamentally flawed. Lesaffre would not even have known of Section 4.1(e) until after it signed the Non-Disclosure Agreement. Id. at ¶ 75. Moreover, plaintiff does not suggest that entering into a non-disclosure agreement was in and of itself suspicious in the context of Lesaffre transaction. These circumstances foreclose an inference that Lesaffre intended to procure Intralytix's breach of Credit Agreement Section 4.1(e) in entering into the Non-Disclosure Agreement because a party cannot be expected to intend to procure a breach of an agreement that it is not aware of.[5]

(2) **Credit Agreement Section 2.5 and STSG's Convertible Promissory Note**

Plaintiff also assets that Lesaffre caused Intralytix to not repay the plaintiff's loan and thereby breach Section 2.5 of the Credit Agreement and the Convertible Promissory Note Intralytix issued to STSG. However, in advancing this claim, plaintiff does not refer to any specific action by Lesaffre. Nor does the amended complaint include any reference to the terms of the Lesaffre transaction that precluded Intralytix from repaying the STSG's

---

[5] Plaintiff further argues that Lesaffre tortiously interfered with Section 4.1(e) of the Credit Agreement by "colluding to keep STSG in the dark concerning the Lesaffre-Intralytix discussions." Pl.'s Reply at 8. This argument fails because the proposed amended complaint does not include any allegation about Lesaffre's conduct after it became aware of the Credit Agreement. Plaintiff cannot cure the defect in its pleading with a conclusory allegation of collusion between Lesaffre and Intralytix.

loan.  Thus, plaintiff fails to allege any activity by Lesaffre, "but for" which there would have been no breach.  <u>Sharma</u>, 916 F.2d at 828.

Plaintiff argues that its allegation that Lesaffre is a third-party beneficiary of the Highflyer Letter Agreement to "induce" the Lesaffre transaction cures this defect.  While the briefing for this motion does not make clear why Lesaffre was made a third-party beneficiary of that Agreement, Lesaffre was not a party to the Letter Agreement, <u>see</u> Prop. Am. Compl., Ex. 14, and plaintiff fails to otherwise allege any involvement by Lesaffre in the negotiation and execution of the Agreement.  The Letter Agreement's designation of Lesaffre as a third-party beneficiary alone is insufficient to sustain a claim of tortious interference with contract.

(3)  **STSG's Second Conversion Right**

Plaintiff also alleges that Lesaffre improperly caused Intralytix to deny its request to convert $250,000 of its loan into 48,430 shares of Intralytix Class A Common Stock and thereby breach its Second Conversion Right.  Prop. Am. Compl. ¶¶ 131-32. However, nowhere in the proposed amended complaint does plaintiff allege any involvement of Lesaffre in this denial.  Apparently, Intralytix denied the STSG's request based on its interpretation of the Credit Agreement and without reference to Lesaffre or any agreement between Lesaffre and Intralytix.  <u>Id.</u>, Ex. 27.

Therefore, the proposed tortious interference with contract claim against Lesaffre based on Intralytix's alleged breach of STSG's conversion right is futile.[6]

### (4)  Security Agreement

Lastly, plaintiff alleges that Lesaffre improperly caused Intralytix to breach the Security Agreement "[b]y securing the right to purchase Intralytix's Intellectual Property in [the case of a] Dissolution Event under the Investors' Rights Agreement." Prop. Am. Compl. ¶ 96.  According to plaintiff, granting this right to Lesaffre constituted a breach of the Security Agreement because "Intralytix irrevocably pledged, assigned to, and granted STSG a security interest in all of Intralytix's Intellectual Property and any proceeds thereof" under the Agreement.  Id.  Regardless of whether there was any breach by Intralytix in granting Lesaffre an option on its intellectual properties,[7] the proposed tortious

---

[6]    The proposed amended complaint also includes a number of allegations suggesting that the stock purchase agreement between Lesaffre and Intralytix, the Investors Right Agreement and the Voting Agreement awarded Lesaffre a number of rights, which STSG would not be awarded upon the conversion of its loan into Intralytix common stock.  These allegations cannot constitute a basis of tortious interference with contract claim because, as long as the conversion by STSG has not taken place, there can be no breach yet of the Credit Agreement Section 7.1, which provides that the STSG's conversion pursuant to the Second Conversion Right "shall be upon the terms and subject to the conditions applicable to the Private Equity Sale."

Plaintiff's claim that Lesaffre improperly caused Intralytix to breach the STSG's Second Conversion Right "by requiring STSG to become a 'party' to the Investors' Rights Agreement as a condition precedent to exercising its Conversion Rights," Prop. Am. Compl. ¶ 96, fails for the same reason.  Moreover, requiring STSG to be bound by the Investors' Rights Agreement may not constitute a breach of the Credit Agreement Section 7.1 if Intralytix imposed the same requirement on Lesaffre.

[7]    The Court notes, without holding, that granting a contingent right to purchase intellectual properties is unlikely to amount to a grant of property interest, which is required for a breach of the Security Agreement.  Under

18

interference with contract claim based on the alleged breach of Security Agreement is futile because plaintiff fails to adequately plead the damages element.

In Kronos, Inc. v. AVX Corp., a patent holder gave Corning a nonexclusive license to produce capacitors under its patents. 81 N.Y.2d 90, 92 (N.Y. 1993). Under the license, Corning was given the "most favored licensee" status, meaning that, if more favorable terms were subsequently negotiated between the licensor and another licensee, the licensor was required to offer Corning the same terms. Id. In 1984, the assignee of the patent—which also assumed the Corning license—entered a license agreement with the defendant under terms more favorable to the licensee than the Corning's license. Id. at 93. Corning learned about this license in 1987 and asked the assignee to renegotiate its license. Id. The assignee maintained that it had no obligation to renegotiate the Corning license. Id. In arguing that the Corning's tortious interference with contract claim against the defendant had accrued in 1984, the defendant proffered two theories of damages caused by the alleged breach: (1) the nominal damages presumed for a contractual breach; and (2) the reduction in value of the Corning

---

Delaware law—which governs the Investors' Rights Agreement pursuant to the choice-of-law clause contained therein—an option holder's rights are entirely contractual without any interest in the underlying subject until the option is exercised. See Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 478 (Del. Ch. 2011)(analyzing the nature of an option holder's interest in the context of securities options).

license resulting from the existence of a license with more favorable terms. Id. at 95. The New York Court of Appeals rejected the first theory on the ground that Corning could not base its claim of tortious breach by the defendant on the nominal damages presumed for the alleged contractual breach by the assignee because those two breaches were separate and distinct. Id. at 96. The court also rejected the second theory, opining that the decline in value of Corning license did not necessarily occur at the moment the assignee and the defendant merely entered the license agreement: until the assignee expressly declined to renegotiate the terms in 1987, either they could have chosen not to follow through on the license agreement or the assignee could have decided to honor Corning's "most favored licenses" status. Id. at 97.

Here, plaintiff fails to allege any actual injury it has suffered because of the option granted to Lesaffre. In fact, the option awarded to Lesaffre becomes exercisable only after a "Dissolution Event," as defined in the Investors' Right Agreement, takes place. Plaintiff does not allege that any such Event has occurred yet. Having failed to adequately plead the damages element, the proposed tortious interference with contract claim against Lesaffre based on the alleged breach of Security Agreement by Intralytix is futile.

d) **Counts V and VI: Tortious Interference with Contract Claim against Woloszyn**

In Counts V and VI, plaintiff asserts tortious interference with contract claims against Woloszyn, who has been an officer of Intralytix throughout the relevant period. Plaintiff claims that Woloszyn tortiously interfered with the Agreements between STSG and Intralytix by operating Intralytix in certain manners.

Under New York law, "a corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer and did not commit independent torts or predatory acts against another." Nahabedian v. Intercloud Sys., Inc., No. 15 Civ. 669(RA), 2016 WL 155084, at *6 (S.D.N.Y. Jan. 12, 2016). "An exception applies, however, where the acts of the defendant corporate officers which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation." Id. (internal quotations omitted).

In Count V, plaintiff claims that Woloszyn improperly induced Intralytix to engage in the following conduct and thereby breach the Agreements: (1) failing to repay the STSG's loan; (2) failing to notify STSG of Intralytix's discussions about the Lesaffre transaction; (3) incurring an additional debt from Woloszyn in his

personal capacity; and (4) denying STSG's information and inspection rights. Defendants argue that plaintiff fails to adequately plead that Woloszyn was either acting beyond the scope of his employment or inducing Intralytix to commit the alleged breaches for personal gain. In Count VI, plaintiff asserts a tortious interference with contract claim against Woloszyn based on his receipt of $1,275,989 upon closing of the Lesaffre transaction. The Court addresses each alleged basis in turn.

### (1) **Failure to Repay the STSG's Loan**

Plaintiff alleges that Woloszyn improperly caused Intralytix to breach the STSG's Convertible Promissory Note by intentionally keeping some balance of the Senior Loan outstanding through Highflyer. The plaintiff's claim on this basis in part involves Woloszyn's conduct as an individual controlling Highflyer beyond the scope of his duties as an Intralytix officer. Therefore, plaintiff adequately pleads the applicability of an exception to the general rule of shielding a corporate officer, and its claim of tortious interference with contract against Woloszyn on this basis is not futile.

### (2) **Incurring Additional Debt from Woloszyn**

Section 5.4 of the Credit Agreement prohibits Intralytix from incurring any additional debt other than the STSG's loan and the Senior Loan. Prop. Am. Compl., Ex. 2, § 5.4. In addition,

Section 5.6 of the same Agreement prohibits Intralytix from transacting with its affiliates unless approved by the Intralytix Board. Id., § 5.6. Plaintiff alleges that Woloszyn improperly caused Intralytix to breach these provisions by inducing Intralytix to incur an additional debt from him.

Because Woloszyn necessarily performed the alleged conduct as an Intralytix officer, plaintiff must allege that Woloszyn was motivated for personal gain in inducing Intralytix to incur a debt from him. Plaintiff alleges that "Woloszyn . . . [was] provided Warrants for Intralytix Class A Common Stock on favorable terms in connection with the loans." Prop. Am. Compl. ¶ 81. The notes memorializing Woloszyn's loan to Intralytix award the noteholders warrants for Intralytix Class A Common Stock with strike prices ranging from $1 to $3 per share, depending on the date of the noteholder's loan. Id., Ex. 19 at 3. Although it is not obvious on the face of the notes how favorable those terms are, an inference can be drawn in favor of the plaintiff's position from the allegation that Lesaffre acquired Intralytix shares at $ 5.162 per share on May 31, 2017. Id. at ¶ 77. Having failed to explain why the alleged warrants awarded to Woloszyn in connection with his loan to Intralytix may not be considered to be personal benefit requisite for pleading the exception's applicability, defendants fail to show the futility of this claim.

### (3) Failure to Notify STSG of the Lesaffre Transaction and Denial of STSG's Information and Inspection Rights

Plaintiff also claims that Woloszyn intentionally procured Intralytix's breaches of Credit Agreement Sections 4.1 and 4.5 by not providing STSG any notice regarding the discussions about the Lesaffre transaction and denying the STSG's demands for information. These purported breaches arise solely from the alleged action or inaction by Intralytix. Accordingly, these claims are necessarily asserted against Woloszyn as an officer of Intralytix. The proposed amended complaint, however, is devoid of any allegation that Woloszyn was acting beyond his position as an officer of Intralytix or that he stood to gain any personal benefit from these alleged breaches by Intralytix. Therefore, this claim is futile under the general rule of shielding a corporate officer.

### (4) Receipt of Payment upon Closing of Lesaffre Transaction

In Count VI of the proposed amended complaint, plaintiff alleges that Woloszyn tortiously interfered with the priority provision of the Credit Agreement by causing Intralytix to pay $1,275,989 in satisfaction of his loan to Intralytix before repaying the STSG's loan. According to plaintiff, "Woloszyn was driven by a desire to preserve the value of his own personal assets" in inducing Intralytix to do so. Prop. Am. Compl. ¶ 197. An officer's decision to prioritize a loan repayment to himself

over the known rights of a more senior creditor is sufficient to plead the applicability of an exception as to the officer.  See Power Up Lending Grp., Ltd. v. Murphy, No. 16 Civ. 1454(ADS), 2017 WL 4410799, at *8 (E.D.N.Y. Oct. 3, 2017)(concluding that the allegation of corporate officers causing the corporation to breach a credit agreement by making the funds available for payments to themselves in compensation and other financial benefits rather than repaying the lender was sufficient to plead the applicability of an exception).  Therefore, defendants have failed to establish the futility of the claim asserted in Count VI of the proposed amended complaint.

> e) **Counts VII and VIII: Specific Performance and Declaratory Judgment Claims regarding STSG's Conversion Rights**

Defendants argue that the plaintiff's claims regarding its conversion rights are precluded by the plain language of the Credit Agreement.  According to defendants, the Second Conversion Right lapsed when the Initial Conversion Option lapsed because Section 7.1 of the Credit Agreement "makes clear . . . that STSG's Second Conversion Right exists only as an alternative to the Initial Conversion Option in the event that a 'private equity sale' occurred during the pendency of the Initial Conversion Option." Defs.' Opp'n (ECF No. 54) at 21 (emphasis added).  The Court rejects this interpretation of the Credit Agreement.

Under New York law, which governs the Credit Agreement pursuant to the governing law clause in the Master Agreement, "[t]he interpretation of a contract is a question of law for the court unless the contract is ambiguous." Broker Genius, Inc. v. Volpone, 313 F. Supp. 3d 484, 500 (S.D.N.Y. 2018). "A contract is ambiguous when on its face it is reasonably susceptible of more than one interpretation." US Oncology, Inc. v. Wilmington Trust FSB, 958 N.Y.S.2d 47, 49 (N.Y. App. Div. 1st Dep't 2013)(internal quotations omitted).

As defendants correctly point out, Section 7.1 of the Credit Agreement provides that the Initial Conversion Option lapses once Intralytix engages in a private sale of its equity yielding gross proceeds of not less than $3 million, and STSG can then exercise only the Second Conversion Right. The language of Section 7.1, however, does not say that the Second Conversion Right also lapses when the Initial Conversion Option lapses.

To the contrary, Section 7.2 of the Credit Agreement provides that "STSG's Conversion Right shall terminate as of the date on which all obligations of Intralytix under the Convertible Note have been satisfied." The same Section further provides that, "Notwithstanding the foregoing, STSG's Initial Conversion Option (as such term is defined in the Master Agreement) shall terminate on the earlier of . . . ." Credit Agreement § 7.2. While the Master Agreement does not define the term "Initial Conversion

Option," the Credit Agreement defines it in Section 7.1. In fact, the Master Agreement's failure to define the term is immaterial in any event because Section 11.14(b) of the Master Agreement provides that the Credit Agreement's definition of the term would have controlled even if it were in conflict with the Master Agreement's definition of it. The term "Initial Conversion Option" as defined in the Credit Agreement does not cover the Second Conversion Right. It then naturally follows that the clause in Section 7.2 of the Credit Agreement addressing the termination of Initial Conversion Option has no implication on the Second Conversion Right. Therefore, the Second Conversion Right terminates only "as of the date on which all obligations of Intralytix under the Convertible Note have been satisfied." Credit Agreement § 7.2.

As there is no dispute that there is a balance outstanding under the Convertible Note, the Second Conversion Right remains effective, and the plaintiff's claims in Counts VII and VIII are not foreclosed by the Credit Agreement. Accordingly, the Court grants the plaintiff's motion as to Counts VII and VIII of the proposed amended complaint.

### f) Count IX: Legal Fees and Expenses against Intralytix

Lastly, plaintiff claims that it is entitled to recover legal fees and expenses incurred in connection with this litigation

pursuant to Section 3.4 (c) of the Security Agreement, which provides:

> Intralytix will pay when due or reimburse STSG on demand for all costs of collection of any of the Obligations and all other reasonable out-of-pocket expenses (including, in each case, all reasonable attorneys' fees) incurred by STSG in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Security Interest or the creation, continuation, protection, defense or enforcement of this Security Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings.

Section 1.5 of the Security Agreement in turn defines "Obligations," which appears in Section 3.4(c), as any kind of "debt, liability and obligation . . . Intralytix may now or at any time after the date of this Security Agreement owe to STSG, under the Credit Agreement, the Loan or the Convertible Note." All of the plaintiff's claims in this litigation can be viewed as stemming from Intralytix's alleged non-repayment of STSG loan and denial to honor the STSG's exercise of Second Conversion Right. Put differently, it is plausible that the subjects of this litigation are the Intralytix's obligations under the Credit Agreement and the Convertible Note, which qualify as "Obligations" for purposes of the Security Agreement Section 3.4(c). That possibility is sufficient at this stage of litigation. Therefore, the Court concludes that the proposed claim for legal fees and expenses is not futile.

### III.   Conclusion

Upon consideration of the proposed amendments and the parties' arguments on their futility, plaintiff's motion for leave to amend the complaint is granted as to Counts III, VI, VII, VIII and IX; granted in part as to Count V; and denied as to Counts II and IV of the proposed amended complaint. Plaintiff is directed to file an amended complaint consistent with this opinion in fourteen (14) days. This Memorandum and Order resolves ECF Docket Entry No. 47.

**SO ORDERED.**


Dated:    New York, New York
          December *10*, 2019


                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE